IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS
MAR 14 2005
JAMES W. McCORMACK, CLERK
By:_____
PLAINTIFFS  DEP CLERK

FORMATION CAPITAL, LLC,
and ARNOLD M. WHITMAN

VS.                No. 4-05 CV00 0 452 SWW

KURT KNICKREHM, DIRECTOR
OF ARKANSAS DEPARTMENT OF HUMAN SERVICES             DEFENDANT

## COMPLAINT

Plaintiffs Formation Capital, LLC ("Formation") and Arnold M. Whitman, by their undersigned attorneys, as and for their complaint against Kurt Knickrehm, Director of the Arkansas Department of Human Services (the "Director of DHS"), respectfully state, on personal knowledge as to their own actions and on information and belief as to all other matters, as follows:

### BACKGROUND

1.  Just one week ago, on March 4, 2005, a bill — entitled the Long Term Care Resident Protection Act of 2005, House Bill 2593 (the "Act") — was introduced into the Arkansas Legislature, the stated purpose of which is to protect "the health, safety and well-being of residents . . . in long-term care facilities and to promote, assure, and maintain the continuity of health, safety and well-being of citizens of the State of Arkansas." Act § 20-10-2002. (The Act is attached hereto as Exhibit A). That stated purpose has no relationship to the Act.

2.  The Long-Term Care Resident Protection Act applies only in the event of a potential change of control of Beverly Enterprises, Inc. ("Beverly") — the only long-term care



company that is now or will ever be subject to its provisions. (The Long-Term Care Resident Protection Act is referenced hereinafter as the "Beverly Act".) While the Beverly Act purports to protect residents of long-term care facilities in the State of Arkansas, Beverly owns no more than twenty (20) of the approximately 235 long-term care facilities within Arkansas, i.e., less than ten percent (10%). The Beverly Act, by its terms, is thus wholly unconcerned with the "health, safety and well-being" of those Arkansas residents who reside in the remaining 90% of the long-term care facilities in this State. Rather, those Arkansas residents (along with those in the Beverly facilities) are protected by the existing extensive regulatory framework — at both the federal and state level — that applies to all long-term care facilities.

3.      The residents of Arkansas in long-term care facilities do not need the Beverly Act for their protection, but the directors and senior-most officers of Beverly, who number among them two of the highest paid executives in the State, do. For the past three months, Beverly's directors and senior management have been resisting an offer made by Formation and others to negotiate a transaction with Beverly (the "Proposed Transaction," more fully described in the Definitive Proxy Statement dated March 14, 2005, attached as Exhibit B hereto), that would provide substantial benefit to its shareholders. Not only did Beverly's Board of Directors and senior management reject the offer out of hand without any discussion with Plaintiffs, they have put in place impediments to any such transaction by, for example, accelerating the date for its 2005 annual meeting of stockholders and the deadline for nominating director candidates for election at that meeting and by implementing a poison pill.

2

4.      Despite Beverly's tactics, Mr. Whitman was able to nominate for election by Beverly's stockholders a slate of independent directors who, if elected, would, consistent with their fiduciary duties, be committed to implementing a process to consider the Proposed Transaction or any other transactions that may be presented to the Board. So, in a last-ditch effort to derail Plaintiffs (and other members of the Consortium) and to the detriment of the shareholders it is supposed to protect, Beverly's board and senior management are using company funds (which could otherwise be used for the benefit of residents of Beverly's long-term care facilities) to finance a massive lobbying effort to have the Legislature hastily pass the Beverly Act without any meaningful debate and without any demonstrable need for its existence. Beverly's board and senior management have also agreed to pay Wall Street investment banks, Lehman Brothers, Inc. and J.P. Morgan Securities, Inc., fees of over $16.5 million to assist senior management in resisting the Proposed Transaction. These investment banking fees are in addition to the $2,700,000 Beverly expects to pay two proxy solicitation firms, lawyers and other advisors working to block the Proposed Transaction. All of this is money that could better be used for the benefit of residents of Beverly's long-term care facilities.

5.      The Beverly Act purports to bar Plaintiffs from even offering the Proposed Transaction to Beverly's shareholders, much less consummating it, without the prior approval of the Director of DHS. The Director's approval may be provided only after a lengthy process in which the incumbent Beverly management is given every opportunity to block and otherwise delay the transaction. Moreover, if the Beverly Act were to be construed broadly, the Director of DHS would purportedly have the right to determine whether Beverly's shareholders may

support the election of directors of their own choice to Beverly's board, despite the fact that the process by which shareholders may choose the company's directors must be exclusively subject to federal law and the law of the state of incorporation (in Beverly's case, Delaware).

6. In the post-Enron era, in which the Sarbanes-Oxley Act and a myriad of other statutes and regulations have been enacted to enhance management accountability to investors, the Beverly Act would operate to entrench Beverly's high-paid senior management. It also blatantly interferes with the rights of shareholders around the nation to determine who should manage and control the corporation they own — a corporation which has the vast majority of its shareholders, employees, and operations outside of Arkansas — as well as the right of others even to propose or discuss potential change of control transactions, in contravention of federal and Delaware law. The corporate control issues have no impact on the quality of life of residents in long-term care facilities in Arkansas who are already protected.

7. In sum, the statute the Arkansas Legislature is on the verge of enacting, misleadingly named the "Long-Term Care Resident Protection Act", has nothing to do with protecting residents of long-term care facilities, and everything to do with protecting Beverly's incumbent directors and senior management team from being voted out of office and/or losing their positions if the Proposed Transaction or some other transaction came to fruition. But the Beverly Act is not just bad policy. It is clearly unconstitutional under both the U.S. and Arkansas constitutions.

## PARTIES

8.  Plaintiff Formation is a limited liability company organized under the laws of the Commonwealth of Pennsylvania with an office located at 1035 Powers Place, Alpharetta, Georgia. Formation, which was founded in 1999, provides equity to the senior housing and long-term care industry, and currently manages assets in excess of $650 million in value. Over the last three years, Formation and its partners have acquired an ownership interest in 152 nursing facilities in 20 states, including 49 skilled nursing facilities and four assisted living centers Formation acquired from Beverly in 2002. Both patient care and financial performance have improved at the facilities acquired from Beverly since they have been owned by Formation.

9.  Plaintiff Arnold M. Whitman is a resident of the State of Georgia and the Chief Executive Officer of Formation. He is currently a beneficial owner of 26,600 shares of Beverly's common stock.

10. Defendant Kurt Knickrehm is the Director of the State of Arkansas Department of Human Services, with an office at Donaghey Plaza, 7th and Main Streets, Little Rock, Arkansas. The Beverly Act endows the Director with the authority to administer and enforce its terms.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because it arises under the Constitution and laws of the United States as well as under 28 U.S.C. § 1367 with respect to the non-federal claims asserted. Because Plaintiffs are seeking only declaratory and injunctive relief against the Director of DHS, pursuant to the well-established

*Ex parte Young* doctrine, the Eleventh Amendment does not affect this Court's jurisdiction over the action. Defendant is an official of the State of Arkansas who resides in this State and District and is subject to personal jurisdiction in this Court.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the defendant resides in this District and/or a substantial part of the events giving rise to the claim has occurred in this District.

## FACTUAL BACKGROUND

### Beverly's Business

13. Beverly is one of the largest owners of nursing facilities in the United States. Although Beverly is headquartered in Fort Smith, Arkansas, it chose to incorporate itself under Delaware law, and it chose therefore for Delaware law to control, among other things, how it is governed. Beverly has approximately 109 million outstanding shares; of those, only about 2 million are owned by residents of Arkansas. Thus, the vast majority of Beverly's shares are owned by persons who reside outside of Arkansas.

14. According to its public filings, Beverly operates over 300 facilities located in 23 states and the District of Columbia, with over 30,000 licensed beds. Within Arkansas, Beverly operates no more than 20 facilities with approximately 2,300 licensed beds. This constitutes less than 10% of the facilities and beds within Arkansas, where there are roughly 240 facilities with 24,105 beds. Indeed, Beverly's presence in Arkansas has recently substantially decreased, due to its sale during 2004 of 10 nursing facilities (with a total of 1,304 beds) located in Arkansas (as well as an assisted living facility) to Perennial Healthcare Management LLC of Maryland.

According to Beverly's public statements, Beverly effected this sale in order to reduce its patient-care liability costs.

15. One of the nursing facilities sold by Beverly was the Saline County Nursing Center in which, according to the Arkansas Advocates for Nursing Home Residents, state investigators found 13 deficiencies in 2003. According to an article published by the Arkansas News Bureau, Nancy Allison of the Arkansas Advocates for Nursing Home Residents and Arkansas State Rep. Stephen Bright, R-Maumelle, both said during a news conference at the time the sale was announced that, under Beverly's management, Saline Nursing Center had a spotty record of resident care over the years and that Beverly should be held accountable. Indeed, Bright is reported to have said: "This horrible example of shifting blame [for selling the facilities by blaming insurance costs] is inexcusable and falls squarely on the shoulders of [Beverly's] corporate bosses in Fort Smith - not on the government, not on taxpayers and certainly not on those injured by abuse or neglect."

16. Beverly has experienced other significant legal and regulatory problems under its current management. It has publicly disclosed that it settled allegations by the federal government of overbilling for $170 million, and that it entered a Corporate Integrity Agreement subjecting it to various audit and compliance requirements beyond those otherwise required by law. Beverly has also disclosed that it is the subject of an ongoing investigation by state and federal authorities in California for overbilling, for which it has reserved $18 million for a potential settlement. Nor are current management's legal problems limited to overbilling: in 2002, Beverly's California subsidiary entered nolo contendere pleas to two felony charges of

Elder Abuse, and agreed to pay the California authorities over $2.5 million in connection with those pleas.

**Beverly's Incumbent Board Refuses to Negotiate and the Proxy Contest Begins**

17. In December 2004, Mr. Whitman contacted Beverly's CEO William Floyd and made an offer to purchase 100% of Beverly's outstanding stock at $11.50 per share, a roughly 30% premium over its market price at the time, on behalf of Formation, Appaloosa Management L.P. and Franklin Mutual Advisers, LLC (the "Consortium"). The Consortium indicated it was willing to consider offering a higher price if it were permitted to conduct due diligence which might reveal additional value in Beverly and might also be willing to consider various alternative transaction structures.

18. Beverly refused to engage in any meaningful discussion with the Consortium. Instead, as further detailed in the Definitive Proxy Statement filed by Mr. Whitman (*see* Exhibit B):

   a. Beverly, on January 21, 2005, accelerated the date of its annual meeting from May 19, 2005 to April 21, 2005, meaning candidates for the board had to be nominated (and any proposals for consideration by the shareholders made) by February 5, 2005 (rather than March 6, 2005) so that, as Mr. Floyd was quoted as saying in the Northwest Arkansas Democrat-Gazette, Beverly could "short-circuit[] the Formation Capital financial group . . . If they wanted to put their directors up for election . . . it would eliminate some of the time they would have to prepare";

b.  Beverly, on January 25, 2005, adopted a so-called "poison pill," making it effectively impossible for Beverly's shareholders to accept the Consortium's premium all-cash offer for their stock without the approval of Beverly's board of directors and/or judicial intervention.

c.  Beverly, on February 3, 2005, only two days before the deadline for nominating new directors, summarily rejected the Consortium's proposals, without having engaged in any negotiation or permitted the Consortium to conduct any due diligence.

19.  On February 4, 2005, in order to provide Beverly's shareholders with a real choice about the future direction of the company, Mr. Whitman nominated a slate of independent directors and announced that he and the Consortium would solicit proxies to support their election to Beverly's board.

**The Beverly Act Is Flawed**

20.  On March 4, 2005, Beverly — knowing that Mr. Whitman had nominated a slate of independent directors committed to fulfilling their fiduciary duties to public shareholders — engaged in a massive lobbying campaign to have the Beverly Act first introduced in the House of Representatives as HB 2593, initially presented a "shell bill" containing no substantive provisions. Due to Beverly's tremendous lobbying efforts, on March 10, 2005, the bill was amended to include the objectionable provisions and immediately approved favorably by the Arkansas House of Representative's Public Health, Welfare and Labor Committee. The bill is reportedly to be voted on by the full House on March 14, 2005.

9

*The Beverly Act Grants Unique Protections to the Incumbent Board of Beverly and to No Other Person or Entity*

21. The Beverly Act purports to impose various burdensome requirements, as detailed below, where there are potential changes in the control of a "long-term care facility owner," as defined in section 20-10-2003(6) which meets certain additional criteria set forth in section 20-10-2004(a). Taking these two sections together, potential changes of control will be subject to the Beverly Act only if the entity in question: is (a) a company with shares traded in the national securities markets; (b) was licensed to operate a minimum of 2,000 beds in Arkansas as of December 31, 2004; (c) had assets in excess of $1 billion as of December 31, 2004; (d) maintained at least 70% of its total resident census in the United States and over 70% of its Arkansas resident census as Medicaid-covered residents, both as of December 31, 2004; and (e) employed in excess of 2,000 full-time employees in Arkansas, as of December 31, 2004.

22. Beverly is the only entity in existence that currently meets these criteria. Moreover, it is the only entity that ever could meet these criteria because four of them are conclusively determined as of December 31, 2004, which has already passed. This is no coincidence. The statute has, and was intended to have, exactly the same effect as a statute that expressly provided that it was applicable only to potential changes of control of Beverly.

23. Moreover, Beverly's board has the unilateral power to decide that the Beverly Act should not apply to it at all. Beverly's incumbent directors are expressly allowed to waive the requirements imposed by the Beverly Act if they were to unanimously choose to do so. § 20-10-2005(b).

10

*The Beverly Act Does Not Protect Patients In Arkansas Long-Term Care Facilities*

24. For decades, long-term care facilities in Arkansas have been subject to myriad federal and state regulatory requirements whose purpose is to protect the health, safety and well-being of residents of such facilities. Even though nothing before the Legislature suggests in anyway that this existing regulatory scheme was not effective, the Beverly Act purports to be intended to protect patients in Arkansas long-term care facilities. It does not do so.

25. The Beverly Act does not even apply to more than 90% of the long-term care facilities in Arkansas that are not owned by Beverly. Nor does it necessarily even apply to the facilities owned by Beverly. A unanimous vote of Beverly's board of a potential change of control of Beverly would exempt a transaction from scrutiny by the Director of DHS. And, the Beverly Act would not apply to any sale by Beverly of one or more (or even all) of its long-term care facilities in the State (such as its sale last summer of ten facilities to an undisclosed buyer). Under these circumstances, the Beverly Act's claim that it is for the "protection of the health, safety, and well-being of residents . . . in long-term care facilities and to promote, assure, and maintain the continuity of the health, safety, and well-being of the citizens of the State of Arkansas" is wholly pretextual.

*The Beverly Act Imposes Unique Burdens and Penalties*

26. The Beverly Act also requires that, at the time of the Beverly Act's enactment, any person who was engaged in conduct that would have required approval from the Director of DHS had it been commenced after the statute's enactment to discontinue such conduct. Beverly Act § 20-10-2004. The only persons arguably carrying out any such activity with respect to

Beverly (the only entity protected by the statute) are Plaintiffs and the other Consortium members. They are thus uniquely singled out by the statute and effectively punished for having failed to comply in advance with a statute that had not yet been enacted and, indeed, had not even been introduced at the time they commenced the activity which might arguably be covered by the statute. By contrast, any other person considering a potential change of control of Beverly would at least be on notice of the Beverly Act and its provisions when deciding whether to pursue such a transaction.

*The Beverly Act Imposes Significant Barriers and Unreasonable Delay on Any Proposal Involving Beverly*

27. Any person wishing to pursue a change of control (as defined in the Beverly Act) of Beverly must first notify the Director of DHS as well as Beverly of that intention, and provide detailed written information to them. The Director of DHS is then required to hold a public hearing (a requirement waivable only in his own sole discretion or that of his designee) and render a written decision as to whether the proposed change of control should be allowed to proceed, evaluating both the proposed acquirer and the substantive terms of the proposed transaction. Beverly is allowed to participate in the hearing, and to appeal a decision permitting the proposed change of control to proceed, with the party who wishes to pursue the change of control precluded from doing so until all appeals have been exhausted.

28. The Director of DHS is not required to hold the hearing or render his decision within any specified time period.

## FIRST CAUSE OF ACTION

## (VIOLATION OF COMMERCE CLAUSE)

29. Plaintiffs repeat the allegations of paragraphs 1 through 28 above as if fully set forth herein.

30. Article I, section 8 of the United States Constitution grants Congress the authority to regulate commerce among the several states and bars the states from imposing undue burdens on interstate commerce (the "Commerce Clause"). The Beverly Act violates the Commerce Clause.

31. The Act both facially against interstate commerce. It does not treat in-state and out-of-state entities equally.

32. The Beverly Act also unduly burdens interstate commerce by allowing the Director of DHS to block a potential change of control transaction involving a Delaware corporation that conducts more than 90% of its business outside of Arkansas and whose shareholders predominantly reside outside of Arkansas where such a transaction complies with all other federal and state laws. No legitimate state interest is raised by the Beverly Act that comes anywhere close to justifying the burden it imposes on commerce.

33. The Beverly Act also illegitimately burdens interstate commerce because it conflicts with the internal affairs doctrine, whereby only the state of incorporation (subject to federal law) may regulate the relations between a company's shareholders and its management. If Arkansas could regulate Beverly's internal affairs in a way inconsistent with Delaware law,

13

so could any of the 22 other states where Beverly owns long-term care facilities, leading to regulatory chaos that would make interstate commerce impossible.

34. If enforced, the Beverly Act would cause irreparable injury to Plaintiffs. Plaintiffs have no adequate remedy at law.

## SECOND CAUSE OF ACTION

### (VIOLATION OF SUPREMACY CLAUSE / WILLIAMS ACT AND EXCHANGE ACT PREEMPTION)

35. Plaintiffs repeat the allegations of paragraphs 1 through 34 above as if fully set forth herein.

36. Article VI of the United States Constitution makes laws duly enacted by Congress the supreme law of the land, notwithstanding any contrary state laws. State laws are accordingly unconstitutional to the extent they are preempted by valid federal statutes, including without limitation the Williams Act (codified at 15 U.S.C. §§ 78m(d) and 78n(d)) and section 14(a) of the Securities & Exchange Act of 1934 (codified at 15 U.S.C. § 78n(a)).

37. The Williams Act reflects the federal policy of providing a level playing field between incumbent management and an outside bidder in contests for corporate control, so that stockholders may make an independent and informed decision with respect to any potential tender offer. The Beverly Act is fatally inconsistent with that federal policy (and thus unconstitutional) for at least four reasons:

    a. it requires any outside bidder to notify the Director of DHS and Beverly of the intent to propose a change of control transaction in advance of actually making an offer to Beverly's shareholders, giving the incumbent

    board and management an unfair ability to respond to the potential offer before the bidder is free to make it to the shareholders;

  b. it allows Beverly's board to exempt any potential change in control transaction which it approves from the hearing requirements of the Beverly Act, giving the incumbent board and management an unfair ability to influence the process;

  c. it imposes a process for a public hearing and appeals therefrom that has no fixed completion date;

  d. it requires the Director of DHS to review the substantive terms of the proposed transaction, rather than allowing the shareholders to evaluate it.

38. To the extent the Beverly Act were interpreted to apply to the Plaintiff's proxy solicitation, it would be preempted by section 14(a) of the Exchange Act, which reflects policies similar to those of the Williams Act in the context of proxy contests, and therefore unconstitutional by virtue of the Supremacy Clause.

39. If enforced, the Beverly Act would cause irreparable injury to Plaintiffs.

## THIRD CAUSE OF ACTION

### (DENIAL OF THE EQUAL PROTECTION OF THE LAWS)

40. Plaintiffs repeat the allegations of paragraphs 1 through 39 above as if fully set forth herein.

41. The Fourteenth Amendment to the United States Constitution bars Arkansas from denying any person within its jurisdiction the equal protection of the laws.

42. The Beverly Act invidiously discriminates against parties interested in acquiring "control" (as defined therein) of Beverly without the unanimous consent of Beverly's directors by subjecting them to burdensome and time-consuming requirements not applicable to parties interested in acquiring such control of any other entity, including any other entity which now or in the future owns or controls long-term care facilities in the Arkansas, and likewise inapplicable to a party acquiring control of Beverly with the approval of its board or acquiring control of specific individual long-term care facilities in Arkansas from Beverly. Since any or all other such potential change of control transactions would pose identical potential risks to the residents of other long-term care facilities, the Beverly Act is not rationally related to advancing the purported goal of the statute.

43. Accordingly, the Beverly Act denies Plaintiffs the equal protection of the laws.

44. If enforced, the Beverly Act would cause irreparable injury to Plaintiffs.

### FOURTH CAUSE OF ACTION

### (BILL OF ATTAINDER)

45. Plaintiffs repeat the allegations of paragraphs 1 through 44 above as if fully set forth herein.

46. Article I, section 10 of the United States Constitution bars Arkansas from enacting any bill of attainder.

47. The Beverly Act singles out named or described persons or groups, namely potential acquirers of Beverly, as well as the even more specific group of Mr. Whitman and the Consortium (the only persons to whom the restrictions of section 20-10-2004(b) could

potentially be applied). The Beverly Act inflicts on that uniquely identified group a deprivation of rights which is punitive in nature without a judicial trial and, in terms of the type and severity of the burdens imposed, cannot reasonably be said to further any nonpunitive legislative purposes.

48. The Beverly Act is accordingly an unconstitutional bill of attainder.

49. If enforced, the Beverly Act would cause irreparable injury to Plaintiffs.

## FIFTH CAUSE OF ACTION

### (VIOLATION OF ARKANSAS CONSTITUTION)

50. Plaintiffs repeat the allegations of paragraphs 1 through 49 above as if fully set forth herein.

51. For the reasons already set forth, the Beverly Act violates the Arkansas Constitution's prohibition against bills of attainder and against statutes which infringe the right to equality before the laws.

52. The Beverly Act is also a special bill which violates the applicable provisions of article V, sections 25 and 26, of the Arkansas Constitution.

53. If enforced, the Beverly Act would cause irreparable injury to Plaintiffs.

WHEREFORE, Plaintiffs demand judgment against Defendant as follows:

A. Declaring and adjudging that the Beverly Act is unconstitutional under the United States Constitution and preliminarily and permanently enjoining defendant Director of DHS, his successors, agents, servants, employees, attorneys, and all persons acting in concert or participation with them from taking any actions to enforce the Beverly Act.

B.   Declaring and adjudging that the Beverly Act violates the Arkansas Constitution and preliminarily and permanently enjoining defendant Director of DHS, his successors, agents, servants, employees, attorneys, and all persons acting in concert or participation with them from taking any actions to enforce the Beverly Act.

C.   Awarding such other and further relief as the Court deems just and proper.

Dated:   March 14, 2005

Respectfully submitted,

Wilson, Engstrom, Corum & Coulter
Attorneys for Plaintiffs Formation Capital,
  LLC and Arnold M. Whitman
200 South Commerce, Suite 600,
Post Office Box 71
Little Rock, Arkansas 72203
(501) 375-6453

By: _____
Nate Coulter
Arkansas Bar No. 85034

OF COUNSEL:
(motions for admission pro hac vice to be submitted)
Stephanie J. Goldstein
Gregg L. Weiner
John W. Brewer
Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, New York 10004
(212) 859-8000

UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

*Exhibits Attached to Original Document in Courts's Case File*